```
            IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF OREGON


UNITED STATES OF AMERICA,
                                         3:14-cr-00186-BR
          Plaintiff,
                                         OPINION AND ORDER
v.

ROGER M. POLLOCK,

          Defendant.
```

**BROWN, Judge.**

On July 23, 2015, Defendant Roger M. Pollock pleaded guilty to making a false statement to a bank in violation of 18 U.S.C. § 1014.  The parties dispute the amount of loss suffered by Defendant's victim, Banner Bank.

The amount of loss determines the base offense level and ultimately the advisory sentencing range.  The government argues the loss is $674,000, which is the amount the Defendant illegally diverted from Banner Bank.  Defendant, however, contends the loss is zero.

On April 8, 2016, the Court held an evidentiary hearing on the amount of loss.  The Court took testimony, received exhibits, heard argument, and directed the parties to submit simultaneous

1 - OPINION AND ORDER

post-hearing briefs by April 13, 2016. The Court took this matter under advisement on April 13, 2016.

For the following reasons, the Court concludes the amount of loss for sentencing purposes is **$674,000**.

## BACKGROUND

Defendant was a successful home builder for more than twenty years. He testified he borrowed a total of $500 million in residential loans during his career as a developer. Defendant testified he treated borrowed money as fungible, thus depositing it all "into one account." Transcript of Hearing (Tr.) 44.

In September 2006 Defendant entered into a contract with Precision Construction Co. to construct a three-story office building in downtown Lake Oswego, Oregon, on land owned by Defendant. Defendant initially paid Precision about $1.6 million from his own funds in periodic installments.

In Spring 2007 Banner Bank agreed to loan Defendant $5,050,000 for construction costs secured by the Lake Oswego property. Banner Bank also extended a line of credit to Defendant for construction costs up to $2,462,710 secured by 66 acres in Happy Valley.

Under the construction loan Banner Bank periodically advanced payments to Defendant based on written disbursement requests from Defendant. The disbursement requests required

Defendant to affirm under oath that he would pay the loan proceeds to the contractors working on the Lake Oswego property.

In early July 2008 Precision submitted Pay Applications 19 and 20.  Based on its building inspector's recommendation, Banner Bank paid Defendant for both applications for a total disbursement of approximately $674,000.  Instead of paying Precision, however, Defendant used the money to pay development costs for a beach-front resort that he was building in Mexico.  Defendant's conviction stems from this theft of the loan proceeds.  Defendant still owns and operates the beach-front resort and boutique hotels in Mexico.

By September 2008 Defendant had defaulted on the construction loan.  Precision stopped working on the project.  Construction liens were placed on the project, which had priority over Banner Bank's interest in the property.  To prevent a potentially catastrophic loss of the entire loan amount, Banner Bank paid $1.5 million to satisfy the construction liens and $1 million to complete construction after retaining a receiver to manage the project.

In April 2009 Banner Bank took ownership of the property through a nonjudicial foreclosure sale for $7.78 million.  This was a credit sale that terminated Defendant's debt to Banner Bank.

After construction was complete in October 2009, Banner Bank

3 - OPINION AND ORDER

decided to keep the Lake Oswego office building and move existing offices from other locations into the building.  Banner Bank did not originally plan to move into the building, but it ultimately did so to mitigate its losses.

## DISCUSSION

### I. Clear and Convincing Standard of Proof Applies

The Court's finding on amount of loss will determine the base offense level under U.S.S.G. § 2B1.1, the United States Sentencing Guideline provision for crimes involving fraud or deceit.  Defendant contends the Court should apply a clear and convincing standard of proof when determining the amount of loss.  The Court agrees.

"District courts generally use the 'preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud.'"  *United States v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015)(quoting *United States v. Treadwell,* 593 F.3d 990, 1000 (9th Cir. 2010)).  If, however, a sentencing enhancement would have a "disproportionate impact" on the sentence, the court should determine whether the totality of the circumstances requires the higher clear and convincing standard.  *Treadwell*, 593 F.3d at 1000 (citing *United States v.*

4 - OPINION AND ORDER

*Jordan,* 256 F.3d 922, 928 (9th Cir. 2001)). The court may consider

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment;
> (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Id.* (citing *Jordan*, 256 F.3d at 928). "Due process is the primary consideration when determining which standard to apply." *United States v. Neuman*, No. 3:11-cr-00247-BR, 2013 WL 6493096, at *2 (D. Or. Dec. 10, 2013).

Here the Court concludes due process requires the higher standard of proof because the Court must make credibility findings on Defendant's testimony. *Cf. Neuman*, at *3 n.1 (court declined to apply clear and convincing standard in part because the loss amount was "not based on issues of credibility that might be resolved differently depending on the standard of proof"). In addition, the potentially significant increase in the guideline range requires the higher standard of proof; *i.e.,* Defendant's base offense level could increase from 7 (for losses of $6,500 or less) to 21 (for losses of more than $550,000).

U.S.S.G. § 2B1.1(b)(1)(A) & (H).  The higher base offense level would increase the resulting guideline range from 0-6 months to 30-37 months assuming a Criminal History Category of II and a reduction for acceptance of responsibility.  Under these circumstances, the Court concludes the government must prove the amount of loss by clear and convincing evidence.

## II. Standards for Calculation of Loss

When calculating the amount of loss, the court "need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence."  U.S.S.G. § 2B1.1 cmt. n.3©.  In calculating loss, the sentencing court uses either the actual loss suffered by the victim or the loss intended by the defendant, whichever amount is greater.  *See United States v. Popov*, 742 F.3d 911, 915 (9th Cir. 2014)(citing U.S.S.G. § 2B1.1 cmt. n.3(A)).

### A. Actual Loss

The guidelines define "actual loss" as the reasonably foreseeable pecuniary harm that resulted from the offense.  U.S.S.G. § 2B1.1 cmt. n.3(A)(i).  The court applies an objective standard when determining "reasonably foreseeable pecuniary harm," which is the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a

potential result of the offense." *Id.*, cmt. n.3(A)(iv).[1]

### B. Intended Loss

The guidelines define "intended loss" as the pecuniary harm that the defendant purposely sought to inflict, including intended pecuniary harm that would have been impossible or unlikely to occur. U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). Unlike actual loss, the court applies a subjective standard. "'Intended loss' does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated." *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011).

### C. Deductions for Collateral

The guidelines provide for certain deductions from the amount of actual loss. If the defendant has "pledged or otherwise provided" collateral, the court deducts from the actual loss any amount that "the victim has recovered at the time of sentencing from disposition of collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). Unlike actual loss, intended loss is not necessarily reduced by the fair market value of pledged collateral, although

---

[1] The Court also excludes from actual loss "[i]nterest of any kind, finance charges, late fees, penalties, . . . or other similar costs." U.S.S.G. § 2B1.1 cmt. n.3(D)(i).

7 - OPINION AND ORDER

collateral may be considered when determining the defendant's intent to cause a loss to the victim.  *See United States v. McCormac,* 309 F.3d 623, 629 (9th Cir. 2002).

### D. Defendant's Gain

Finally, "[i]f it is not feasible to determine the actual or intended loss, district courts may use the defendant's gain as another way to measure the loss."  *United States v. Martin*, 796 F.3d 1101, 1111 (9th Cir. 2015)(citing U.S.S.G. § 2B1.1 cmt. n.3(B)("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.")).

## III. Determining the Amount of Loss

### A. Actual Loss

To calculate the actual loss to Banner Bank, the Court must determine the amount of loss caused by Defendant's theft, excluding interest payments and penalties, and then subtract the fair market value of the collateral pledged by Defendant.  The guidelines provide the fair market value of retained collateral is determined as of the date of sentencing.  Here, however, the Court agrees with the parties that because almost eight years have elapsed since the offense and market conditions have changed drastically, it is unreasonable to deduct the fair market value of the collateral as of the time of sentencing.  As the Ninth Circuit has noted in a similar context, "[t]he volatile nature of

8 - OPINION AND ORDER

the real-estate market is wholly independent of Defendants' actions and, for sentencing purposes [Defendants] should not benefit" from the increase in value.  *United States v. Crandall*, 525 F.3d 907, 914 n.8 (9th Cir. 2008).

The Court, therefore, concludes the relevant date for determining the value of the collateral is April 2009, the date of the credit sale.  The Court, however, agrees with the government that it cannot make a reasonable determination of the actual loss under these facts.  For example, the government argues if the Court decides to determine actual loss, the fair market value of the building should be based on an appraisal that found the "as is" value to be about $6.3 million on April 13, 2009.  Gov't Ex. 1 at 56.  The Court concludes, however, the "as is" value is inherently speculative because both the credit and real-estate markets were plummeting at that time.

Defendant, in turn, argues the Court should consider the $8 million valuation for the property reported by Banner Bank to the Internal Revenue Service based on the April 2009 credit sale.  Def.'s Ex. 19 at 1, ECF No. 130.  The Court disagrees.  Although a lender "may receive something of *value* from purchasing collateral in a foreclosure sale using a credit bid, the lender does not 'recover' any amount of money until the property is ultimately sold to a third party."  *United States v. Kerley*, 784 F.3d 327, 348 (6th Cir. 2015)(emphasis in original).   Here the

9 - OPINION AND ORDER

property was not sold to a third party.  Thus, the $8 million valuation is not useful in determining fair market value.  *See United States v. Green*, 648 F.3d 569, 584 (7th Cir. 2011)("Where a lender forecloses and acquires the property at public auction by making a credit bid (*i.e.,* a bid that offers to cancel the outstanding principal, interest, and related fees in return for title to the property), the credit bid is not a reliable measure of the actual market value of the property.").

The Court also concludes the fair market value of the collateral as of April 2009 is inextricably intertwined with Banner Bank's efforts to mitigate its losses by taking over the construction of the office building.  Although unfinished, the property had value, and Banner Bank added value by paying off the construction liens and completing the construction.

On this record the Court agrees with the government that "determining the fair market value of the collateral pledged at the time that [Defendant] stole money from the bank is really a very tricky prospect."  Tr. 82.  The Court, therefore, concludes on this record that actual loss cannot reasonably be calculated because the value of the collateral at the time of the foreclosure sale cannot be determined with sufficient accuracy.  On the other hand, the Court finds calculation of the intended loss is straightforward and is a fair assessment of the harm caused by Defendant.

**B.  Intended Loss**

The parties dispute the amount of intended loss.  Defendant testified he did not purposefully seek to inflict pecuniary harm on Banner Bank nor did he intend to cheat Banner Bank out of the $674,000 disbursement.  Defendant testified after he illegally diverted the disbursement, he was "anticipating another draw [from Banner Bank], and we just thought we would pay the bills and just continue forward."  Tr. 42.

The Court concludes Defendant intended to steal the disbursement money to fund his project in Mexico and that he never intended to repay the bank for its loss; *i.e.,* Defendant's actions belie his words.  When Defendant diverted the money, he knew he did not have the ability to continue making payments on the construction loan.  Tr. 51.  As an experienced home developer, Defendant knew his failure to pay Precision would cause construction liens to be placed on the property and that the construction liens would have priority over Banner Bank's interest.  Defendant also knew the real-estate market was in a severe recession, which made any sale of the property problematic at best.  The Court, therefore, concludes Defendant purposefully sought to deprive the bank of $674,000.

## CONCLUSION

For these reasons, the Court concludes the amount of loss

11- OPINION AND ORDER

for sentencing purposes is the intended loss of **$674,000**. As an alternative, the Court determines the amount of gain to Defendant was also $674,000.  *See United States v. Martin*, 796 F.3d 1101, 1111 (9th Cir. 2015).

    IT IS SO ORDERED.

    DATED this 29th day of April, 2016.

                                          /s/ Anna J. Brown

                                         _____
                                         ANNA BROWN
                                         U.S. DISTRICT JUDGE